2020 IL App (1st) 200866-U
No. 1-20-0866

FIRST DIVISION
October 11, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 09 CR 08810 |
| | ) | |
| JERMAINE CRADDOCK, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Stanley L. Sacks, |
| | ) | Judge Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Hyman and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held:* The trial court's summary dismissal of the defendant's *pro se* postconviction petition is affirmed where defendant's claim of ineffective assistance of appellate counsel was frivolous and patently without merit in that it had no arguable basis in law or fact.

¶ 2    Defendant appeals the first-stage dismissal of his postconviction petition in which he alleged, *inter alia*, that his appellate counsel was ineffective for failing to challenge the trial court's decision to allow him to proceed *pro se* when defendant was not mentally competent to do so. Defendant was originally charged in a 126-count indictment with predatory criminal sexual assault,

aggravated kidnapping, and related offenses stemming from an incident involving 12-year-old L.W. on April 17-18, 2009. Following a bench trial, at which defendant proceeded *pro se*, defendant was convicted of three counts of predatory criminal sexual assault and one count of aggravated kidnapping. He was sentenced to eight years on each of the predatory criminal sexual assault convictions and six years for aggravated kidnapping, all sentences to run consecutively for an aggregate 30-year term of imprisonment.

¶ 3                                BACKGROUND

¶ 4        Defendant previously challenged his conviction on direct appeal. At that time, he argued that the cause should be remanded for a retrospective fitness hearing before a new trial judge where the original judge found a *bona fide* doubt as to his fitness but failed to hold a fitness hearing prior to trial. *People v. Craddock*, 2014 IL App (1st) 121447-U. Defendant also contended that the trial court abused its discretion by denying his request for standby counsel and sought for his mittimus be corrected to properly reflect his conviction for aggravated kidnapping. *Id.*

¶ 5        On direct appeal, we presented a procedural history of defendant's case as well as a brief review of the evidence presented at trial, and we rely, in part, upon that presentation here and recount additional evidence as needed. Prior to trial, defendant was evaluated for fitness to stand trial four different times. Less than a month after he was arraigned, in which he was assigned an assistant public defender (APD), the APD requested a behavioral clinical examination (BCX) for defendant because he told her that he was on medication and did not understand the charges or trial procedure. On June 30, 2009, Doctor Susan Messina examined defendant and opined that he was fit to stand trial and had the ability to understand his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Doctor Messina also opined that defendant "evidenced an adequate understanding

for courtroom procedure and the roles of court personnel and is capable of assisting counsel in his defense." She noted that defendant "is prescribed psychotropic medication."

¶ 6        Doctor Roni Seltzberg examined defendant on July 13, 2009, and determined that defendant was fit to stand trial, but she could not complete her evaluation as to defendant's ability to understand *Miranda* because she had not received the necessary medical records. Regarding defendant's fitness to stand trial, she opined that he "was able to demonstrate [an] understanding of the nature of the charges against him, the purpose of the proceedings against him, and he has the ability to assist counsel in his defense other than for his reported lack of memory for the specific allegation against him[.]" Doctor Seltzberg noted that "his current Medication Profile reflects that he has no medications on file" but he may have been recently prescribed Risperidone.

¶ 7        During several pretrial hearings, defendant indicated that he wanted to proceed *pro se* and, at times, expressed a desire for the trial court to appoint standby counsel to assist him. The trial court denied defendant's request for standby counsel and explained to defendant that he had the option of either proceeding with counsel representing him or going *pro se*. On January 21, 2011, the trial court admonished defendant pursuant to Illinois Supreme Court Rule 401 (eff. July 1, 1984), which governs a criminal defendant's waiver of counsel, defendant acknowledged that he understood those admonishments, the APD was granted leave to withdraw, and defendant proceeded *pro se*. During the numerous pretrial hearings, however, defendant also expressed a desire to be represented by private counsel, but he was unable to afford an attorney. He met with attorneys from private law firms to represent him *pro bono*, but, after consulting with them, they declined to do so. When the trial court explained to defendant that the APD could be re-appointed to represent him, defendant repeatedly stated that he did want the services of the APD.

¶ 8        On April 20, 2011, the court re-admonished defendant as to the charges and the penalties, the difficulties around self-representation, as well as Supreme Court Rule 401. On the next court date, after defendant's mother told the court that defendant was not capable of representing himself, the trial court referred defendant to Forensic Clinical Services to conduct another evaluation as to defendant's fitness to stand trial. On May 31, 2011, Doctor Roni Seltzberg evaluated defendant for a second time and again found him fit to stand trial. The doctor noted that defendant was prescribed psychotropic medications and there was no indication of any significant adverse effects from the medications on his fitness, although it was unclear whether he required those drugs to maintain his fitness. The doctor opined that defendant "was able to demonstrate his understanding of the nature of the charges against him, the purpose of the proceedings against him, and he is capable of assisting counsel in his defense if he so chooses." The doctor diagnosed him with polysubstance dependence and personality disorder with antisocial features.

¶ 9        On August 19, 2011, Doctor Susan Messina evaluated defendant for a second time and again found him fit to stand trial. Regarding defendant's fitness to stand trial, she opined that defendant "evidenced an adequate understanding for courtroom procedure and the roles of court personnel and is capable of assisting counsel in his defense at trial." The doctor noted that defendant was currently prescribed psychotropic medication.

¶ 10        On November 23, 2011, after being fully admonished, defendant waived a jury and proceeded *pro se* to a bench trial which began on November 28, 2011. The evidence at trial showed that at about 11 p.m. on April 17, 2009, defendant led L.W. to a building at 4835 West Monroe Street where he raped her. The next morning, L.W. went home and outcried to her mother. Her mother testified that L.W. told her on their way to the hospital that a man had forced his penis into her vagina and anus, and he forced oral sex on her. L.W. underwent a physical exam at the hospital

where swabs were taken from her vagina and anus. L.W. also spoke to police at the hospital. When L.W. returned home she again met with police and identified defendant from a photo array as the man who raped her. Defendant was arrested and subjected to a buccal swab that generated a DNA profile for him. The DNA from the swabs taken from L.W.'s vagina matched defendant's DNA profile, and the anal swabs found a mixture of two human DNA profiles, *i.e.*, one male and one female, from which defendant could not be excluded.

¶ 11 During defendant's case-in-chief, the trial court admonished defendant regarding his right to testify and asked if he wanted to testify. Defendant did not respond, and then the court stated, "don't look to the State for help. It's up to you." Defendant responded that he wished to testify, and then asked the State if it wanted to question him. The court admonished defendant that the State could not ask him questions until he testified. Defendant ultimately did testify, and stated that he never raped L.W. Following closing arguments, the trial court found defendant guilty of aggravated kidnapping and four counts of predatory criminal sexual assault.

¶ 12 Defendant obtained private counsel who filed a motion for a new trial, arguing that the court should have held a hearing to determine if defendant was on medication at the time of trial and whether he was fit while on medication. In denying the motion, the court indicated that it ordered several BCXs which all concluded defendant was fit for trial. The court specifically stated, "Every time he appeared before me although on occasion he was somewhat recalcitrant or somewhat annoying, I have no doubt whatsoever bonifide [*sic*] or otherwise upon his fitness to stand trial, I felt he was fit, and I still think he is fit." The trial court also concluded, upon reconsideration, that the evidence did not establish the element of penetration in Count 7 which alleged contact between defendant's mouth and L.W.'s vagina. Accordingly, the court vacated the finding as to Count 7. The court then sentenced defendant to an aggregate 30-year term of imprisonment.

¶ 13 On appeal, we remanded the cause back to the trial court judge for a retrospective fitness hearing after we found that the trial court failed to conduct a fitness hearing upon finding that there was a *bona fide* doubt of defendant's fitness. *Id.* at ¶ 18. As to the trial court's denial of defendant's request for a standby counsel, we reviewed this issue for plain error and found that there was no error as the trial judge did not abuse his discretion in not appointing standby counsel and there was no structural error as the denial of standby counsel cannot be deemed structural. *Id.* at ¶¶ 23-28.

¶ 14 On remand, a retrospective fitness hearing was held on February 1, 2017, where defendant was represented by an APD. Doctor Susan Messina testified that she interviewed defendant on August 9, 2011. Doctor Messina testified that she reviewed records that included, in pertinent part, a previous psychological summary that she had prepared in 2009, police reports, an advisement of rights and waiver form, psychological history from 2009, clinical history report from 2011, various hospital records, and two psychiatric summaries from Doctor Roni Seltzberg. She testified that defendant understood the charges and the roles of the participants in the courtroom. She diagnosed him with polysubstance dependence and found him fit to stand trial. She explained that a person can have some mental issues and still be fit to stand trial.

¶ 15 Defendant testified that in 2011, when his trial was approaching, he was depressed, stressed out, confused, and unsure about a lot of things. He further stated that he was on Zoloft, Risperidone and Depakote during the trial, but was taking the medications "off and on[.]" He admitted that he knew the roles of the judge, prosecutor, and defense attorney in 2011. At the conclusion of the hearing, the trial court found that defendant was fit to stand trial in 2011.

¶ 16 Defendant appealed the trial court's decision. On June 18, 2019, we issued a summary order after defendant's appellate counsel filed a motion requesting leave to withdraw as counsel based on the conclusion that an appeal in this case would lack arguable merit. *People v. Craddock*, No.

1-17-0758 (unpublished order pursuant to Rule 23). We granted counsel's motion for leave to withdraw as appointed counsel on appeal and affirmed the judgment of the circuit court.

¶ 17     On December 19, 2019, defendant filed a *pro se* postconviction petition in which he alleged, *inter alia*, that his appellate counsel was ineffective for failing to raise and argue that "the State should have insisted upon representation by counsel for [defendant] as a *pro se* defendant who suffered from a mental illness to the point where he was not competent to conduct trial proceedings by himself, and that the trial judge should have denied [defendant] who lacked the mental capacity to conduct his defense without the assistance of counsel." In a written order dated March 11, 2020, the postconviction court found the issues raised by defendant to be frivolous and patently without merit and dismissed the petition for postconviction relief.

¶ 18                                                    ANALYSIS

¶ 19     Defendant contends that we must reverse the summary dismissal of his postconviction petition and remand for second-stage proceedings where he set forth an arguable claim of ineffective assistance of appellate counsel for failing to raise the issue on direct appeal that the trial court should not have allowed defendant to represent himself *pro se* at trial. Defendant contends that his history of mental illness, the repeated fitness examinations, and his behavior in court showed that he did not have the mental capacity to represent himself. In turn, the State argues that the trial court's summary dismissal of defendant's postconviction petition must be affirmed where defendant's argument has no arguable basis in law or fact as there is no evidence to show that he suffered from the kind of "severe mental illness" required to permit the trial court to deny defendant's request to represent himself.

¶ 20     The Post-Conviction Hearing Act (Act) provides a procedural mechanism through which a defendant may assert a substantial denial of his constitutional rights in the proceedings which

resulted in his conviction. 725 ILCS 5/122-1 *et seq.* (West 2018). At the first stage of postconviction proceedings, the circuit court must determine whether the defendant's postconviction petition is "'frivolous or is patently without merit.'" *People v. Boykins*, 2017 IL 121365, ¶ 9 (quoting 725 ILCS 5/122-2.1(a)(2) (West 2014)). The circuit court may only summarily dismiss a petition as frivolous or patently without merit where the petition "has no arguable basis either in law or fact." *People v. Hodges*, 234 Ill.2d 1, 16 (2009). A petition has "no arguable basis either in law or in fact" where it is "based on an indisputably meritless legal theory or a fanciful factual allegation." *Id*. "An example of an indisputably meritless legal theory is one that is completely contradicted by the record," and "[f]anciful factual allegations include those that are fantastic or delusional." (Internal quotation marks omitted.) *People v. White*, 2014 IL App (1st) 130007, ¶ 18. During first stage postconviction proceedings, "the courts treat allegations of fact as true so long as those allegations are not affirmatively rebutted by the record." (Internal quotation marks omitted.) *Id*. We review *de novo* the summary dismissal of a postconviction petition. *People v. Tate*, 2012 IL 112214, ¶ 10. The trial court's judgment is considered, not the reasons cited, and that judgment may be affirmed on any basis supported by the record if the judgment is correct. *People v. Lee*, 344 Ill.App.3d 851, 853 (1st Dist. 2003).

¶ 21    Defendant contends that his appellate counsel was ineffective. Defendants have a constitutional right to the effective assistance of counsel at trial and on direct appeal under the United States Constitution and the Illinois Constitution. *People v. Jackson*, 205 Ill.2d 247, 258-59 (2001); U.S. Const., amends. VI, XIV; Ill.Const. 1970, art. I § 8. Under the *Strickland* standard, "[t]o prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Cathey*, 2012 IL 111746, ¶ 23 (citing *Strickland v. Washington*, 466 U.S. 668, 687

(1984)). Specifically, the defendant must demonstrate "that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *People v. Domagala*, 2013 IL 113688, ¶ 36. During first-stage proceedings, "a defendant need only show that he can arguably meet those two standards, *i.e.*, it is *arguable* that his counsel was deficient and it is *arguable* that the outcome of his case would have been different absent the deficient representation." *Id*. (Emphasis in original.) It is well-established that "the *Strickland* standard applies equally to claims concerning trial and appellate counsel. *People v. Petranko*, 237 Ill.2d 490, 497 (2010).

¶ 22     Generally, a criminal defendant has a constitutional right to represent himself if he makes an unequivocal request to do so. *People v. Silagy*, 101 Ill.2d 147, 179 (1984). When a defendant elects to proceed *pro se*, the trial court is required to admonish him of the nature of the charge, the possible penalties should he be convicted, and his right to be represented by counsel. Ill.Sup.Ct.R. 401(a) (eff. Jul. 1, 1984). Here, it is undisputed that the trial court properly admonished defendant pursuant to Rule 401 and that defendant knowingly and voluntarily waived his right to counsel.

¶ 23     This court has previously recognized that, "[f]or many years, constitutional law required courts to allow a defendant to proceed *pro se* as long as the defendant was fit to stand trial and the judge was satisfied that the defendant understood the admonishments and was executing his or her waiver of counsel knowingly and voluntarily." *People v. Sheley*, 2012 IL App (3d) 090933, ¶ 20 (citing *People v. Lego*, 168 Ill.2d 561 (1995)).

¶ 24     However, in *Indiana v. Edwards*, 554 U.S. 164, 178 (2008), the United States Supreme Court found that to effectively exercise the constitutional right to self-representation, a defendant must have the mental capacity to conduct his own defense. Pursuant to *Edwards*, a court may deny a

request for self-representation on the part of a defendant who is fit to stand trial but who suffers from such "severe mental illness" that he is "not competent to conduct the trial proceedings" by himself. *Edwards*, 554 U.S. at 177-78. However, a defendant's request to proceed *pro se* may not be refused simply because he is ignorant regarding "the technical rules of law" (*People v. Fisher*, 407 Ill.App.3d 585, 589 (4th Dist. 2011)), or because the trial court believes that the defendant's choice is "ill-advised, unwise, or unsound, however correct that opinion may be" (*People v. Ward*, 208 Ill.App.3d 1073, 1985 (4th Dist. 1991)). A trial court's decision concerning a defendant's request for self-representation is reviewed for an abuse of discretion. *People v. Rohlfs*, 368 Ill.App.3d 540, 545 (3rd Dist. 2006).

¶ 25    In resolving this issue, we look to the factors considered by courts in other cases. For instance, in *Sheley*, the court looked at the determinations made by the doctors during the behavioral clinical examinations in which these doctors did not diagnose a several mental illness, the defendant was of average intelligence, he was "within the normal range of executive function", he understood the charges against him, and he was knowledgeable regarding courtroom proceedings. *Id.* ¶¶ 25-27. The *Sheley* court also looked at whether defendant was coherent and capable of participating effectively in a conversation. *Id.* ¶ 28; See also *People v. Rainey*, 2019 IL App (1st) 160187, ¶¶ 74, 78 ("A defendant's lack of civility and decorum, unlike his lack of legal ability, is a valid basis for denying his request for self-representation" but the "courts generally require a persistent pattern of pre-trial misconduct, and not just a single, isolated instance…").

¶ 26    In *People v. Allen*, 401 Ill.App.3d 840, 851 (1st Dist. 2010), we found that the defendant "was able to carry out the basic tasks needed to present his own defense without the help of counsel" such as the defendant's ability to make an opening statement and closing argument, cross-examine witnesses, entered exhibits into evidence, objected to witness' testimony and submitted jury

instructions. We also considered that the defendant was articulate when he conversed with the trial court as the trial court explained to the defendant the difficulties inherent in *pro se* representation. *Id*. at 852.

¶ 27    Likewise, in the present case, the trial record does not establish that defendant suffered from a "severe mental illness" that affected his competency for self-representation. See *Edwards*, 554 U.S. at 178. While defendant is correct that he was examined four different times prior to trial to determine his fitness to stand trial, none of these evaluations provide evidence to support a conclusion that defendant suffered from a "severe mental illness" at the time of trial. Both Doctor Messina and Doctor Seltzberg evaluated defendant on two different occasions prior to trial. In each of these instances, they found that he was fit to stand trial and did not determine that defendant suffered from a "severe mental illness." We recognize that, in 2011, Doctor Seltzberg diagnosed defendant with polysubstance dependence and personality disorder with antisocial features. However, defendant does not suggest, nor is there any evidence to support the conclusion that this diagnosis constituted a "severe mental illness."

¶ 28    While defendant contends that he did not understand the roles of the parties evidenced by the fact that he sought help from the judge and the prosecution during trial, the record does not support this claim. Doctor Messina evaluated defendant twice, and she found on both occasions that defendant "evidenced an adequate understating for courtroom procedure and the roles of court personnel and is capable of assisting counsel in his defense." Likewise, both times Doctor Seltzberg evaluated defendant, she found that he "was able to demonstrate understanding of the nature of the charges against him, the purpose of the proceedings against him, and he has the ability to assist counsel in his defense…" We also note that, during the retrospective fitness hearing,

defendant testified that he knew the roles of the judge, prosecutor, and defense attorney at the time of his 2011 trial.

¶ 29　　Moreover, the record shows numerous instances in which there were articulate exchanges between defendant and the trial court regarding his understanding and acceptance of the perils of self-representation. Beyond providing defendant the requisite admonishments pursuant to Rule 401, the trial court repeatedly spoke with defendant regarding his decision to represent himself *pro se* and even offered for defendant speak with private attorneys who could represent defendant *pro bono.* Despite the trial court's repeated admonishments about the perils of representing himself *pro se*, defendant repeatedly insisted that he wanted to represent himself *pro se*.

¶ 30　　Defendant was also able to perform the basic tasks during trial where he filed pre-trial motions, requested a list of witnesses from the State, asked the State to clarify what discovery had been tendered, and asked for additional discovery from the State. During trial, he presented an opening statement, a closing argument, conducted a cross-examination of each of the State's witnesses, and presented the testimony of a defense witness and a theory of defense to the charges which was coherent, albeit unsuccessful.

¶ 31　　Defendant also relies upon instances in which he advanced unsuccessful trial strategies. For instance, defendant points to his arguments that the 126-count indictment was the product of prosecutorial vindictiveness, of the prosecution seeking vengeance, double jeopardy, and selective prosecution. During closing argument, defendant asked for a mistrial because of the large number of counts in the indictment. Defendant's legal challenges to the indictment do not support his claim that he suffered from a "severe mental illness" and instead, evidenced his ability to understand, assess, and think critically about a somewhat complicated legal concept. Even if we were to find that defendant displayed a lack of legal sophistication, we have previously recognized:

> "…if a lack of legal sophistication or the advancement of unsupported legal theories, unsuccessful trial strategies, and unwise tactical decisions were a basis on which to conclude that an individual is not competent to conduct court proceedings, it would be nearly impossible for any non-legally trained criminal defendant to exercise his or her right to self-representation. The fact that defendant lacked the legal knowledge and experience to make successful arguments and tactical decisions that were supported by existing law and the evidence in the case simply demonstrates what has been long known and repeated in the context of self-representation – the decision to represent oneself is not wise or prudent. No matter how unwise such a decision may be, however, courts are obligated to respect a defendant's decision to exercise his right to self-representation." *People v. McNutt*, 2020 IL App (1st) 173030, ¶ 97 [Citations omitted].

¶ 32    Defendant also points to a report from 1997 stating that he had an IQ of 80. Obviously, this report is outdated where it is dated 14 years before defendant's trial. More recently, Doctor Roni Seltzberg assessment of defendant showed that he had "average" intelligence. And, while defendant never graduated from high school, his lack of education did not appear to hinder his ability to represent himself during the trial. Moreover, his lack of education, alone, does not support a finding of "severe mental illness."

¶ 33    Defendant also asks us to consider Doctor Seltzberg's summary report of her interview with defendant on July 13, 2009, showing that, at the age of nine, defendant suffered from hallucinations and had been hospitalized for mental illness, he was prescribed medication for auditory hallucinations, along with his testimony from the retrospective fitness hearing that he still hearing voices. However, Doctor Seltzberg already considered this information regarding defendant's auditory hallucinations when making her determination that defendant was fit to stand trial. We also note that Doctor Seltzberg reported that, during the May 31, 2011 interview, defendant told her that he was "'stable right now,' though he had been 'lacking some therapeutic sessions as a child." We do not find that this information would lead to the conclusion that defendant suffered from a "severe mental illness" at the time of his trial.

¶ 34    In sum, we find that there was no arguable basis to defendant's postconviction claim that the trial court erred in allowing him to represent himself *pro se* at trial based upon his mental incompetence. Finding no merit to this contention, we likewise find that there is no arguable basis for defendant's claim that his appellate counsel was ineffective for failing to raise this issue on direct appeal. Therefore, we find that defendant failed to set forth the gist of a constitutional claim that satisfied the low threshold for pleading a claim at the first stage of postconviction proceedings. Accordingly, we affirm the trial court's summary dismissal of defendant's postconviction petition.

¶ 35                                    CONCLUSION

¶ 36    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 37    Affirmed.